# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Trustees of the Chicago Plastering Institute )
RONALD PLUNK, SR., RONALD PLUNK, )
JR., ALLIED NURSERY, INC., an Illinois )
Corporation, and ALLIED LANDSCAPING )
CORPORATION, an Illinois Corporation, )
                                                            )
                        Plaintiffs,        )       Case No. 07 C 88
                                                            )
      vs.                                             )       Magistrate Judge Susan E. Cox
                                                            )
VILLAGE OF ELWOOD, Illinois, a Municipal )
Corporation, and ROBERT BLUM, AIMEE )
INGALLS, DAVID ALBERT, and GEORGE )
DONCHEZ, JR., Individually, )
                                                            )
                        Defendants.        )

## <u>Memorandum Opinion and Order</u>

This is a civil rights action brought by two members of the Plunk family, Ronald Sr. and Ronald Jr., and their companies, Allied Nursery, Inc. and Allied Landscaping against the following defendants: (1) Village of Elwood ; (2) members of its Village government; and (3) their police department. The case is set for trial in August of this year. Anticipating this, both sides have filed a slew of pretrial motions on which the Court is now prepared to rule. Defendants' motions are as follows: (1) defendants' motion for leave to file affirmative defenses (dkt. #111); (2) defendants' motion to bar testimony (dkt. #107); (3) defendants' motion to re-depose plaintiffs' expert (dkt. #108); and (4) defendants' motion to re-open discovery (dkt. # 109). Plaintiffs' Motions are as follows: (1) plaintiffs' motion to compel production of certain Village meeting reports (dkt. 115); (2) plaintiffs' motion for fees (dkt. #116); (3) plaintiffs' motion to re-open discovery (dkt. #117); and (4) plaintiffs' motion for

sanctions (dkt. #114). Prior to ruling, however, it makes sense to set out both the allegations involved and the unusual procedural history of this case.

I. <u>Factual Allegations</u>

The facts that plaintiffs will attempt to prove at trial are as follows: plaintiffs Ronald Plunk, Jr. ("Ron Jr."), Ronald Plunk, Sr. ("Ron Sr."), Allied Nursery, Inc. ("Nursery"),(a corporation owned by Ron Sr.) and Allied Landscaping ("Landscaping"), (a corporation owned by non-party Margaret Plunk, which employs Ron Jr.), have sued defendants alleging a variety of federal and state causes of action. Landscaping entered into various contracts with the Illinois Department of Transportation ("IDOT") for work to be done within Elwood. Nursery also performed work for Elwood, including a contract to mow Elwood's public areas. Sometime toward the end of 2005, these relationships began to sour. One reason for this was because Elwood contracted with one of Landscaping's competitors without allowing Landscaping to first offer a bid. Elwood's Village Manager Scott Haywood then made derogatory statements about the quality of Nursery's work to Ron Sr. and Ron Jr. during a conversation at City Hall on March 22, 2006. (The Complaint goes on to allege that he did this at the behest of Mayor Blum, a defendant in the case.) The City Clerk, Patricia Buchenau, informed defendant police chief David Albert, also a defendant, about the conversation between Haywood and the Plunks.

After Chief Albert learned about this conversation, he, along with two additional police officers, including defendant police officer Donchez went to arrest Plunk Sr.. The police officers detained both Plunks while another police officer was dispatched to bring Mr. Haywood to the scene. Although Chief Albert urged him to file a complaint alleging that he

had been threatened by Ron Sr., Haywood allegedly declined to press charges. After he refused to do so, both Plunks were allowed to leave the scene. However, at the Mayor's request, Chief Blum signed a complaint against Ron Sr. for aggravated assault based on the conversation between Haywood and Ron Sr. at the Village Hall earlier that day. A warrant was issued for Ron Sr.'s arrest.

When Ron Sr. learned of the warrant for his arrest, he surrendered and posted bail. The Complaint alleges that Chief Albert nevertheless ordered defendant Donchez to arrest Ron Sr. Officer Nicholas Adams, who is not a defendant, accompanied Officer Donchez for the arrest. When Ron Sr.'s wife, Margaret Plunk, complained about this incident to Chief Albert, he told her that she should take her complaint to the Illinois State Police. A few months later, the judge presiding directed a verdict for Ron Sr. on the aggravated assault charge.

This did not end the acrimony between Elwood and the Plunks. Plaintiffs allege that beginning in 2007, Elwood, its Mayor, and the Village Administrator, Aimee Ingalls, conspired to negatively affect Nursery and Landscaping's ongoing business relationships. The first of these alleged acts involved a subcontract that Landscaping had with D Construction, Inc., ("D Construction") another construction contractor. According to the Complaint, Administrator Ingalls told D Construction that Elwood did not want it to subcontract with Landscaping on any Elwood contract. D Construction had entered into a subcontract with Landscaping for $120,100.50 on a prime contract it had with IDOT for a joint venture with Elwood called the Mississippi Avenue Project. Although D Construction told Elwood that Landscaping had done good work for it in the past, Mayor Blum told it that this fact "doesn't have anything to do with this, and I want to make sure that Allied Landscaping doesn't make

another nickel in Elwood." On April 19, 2006, the Elwood Board of Trustees then voted to remove Landscaping from the subcontract and to delegate any further policymaking on this matter to Mayor Blum and Administrator Ingalls. This matter did not appear on the agenda for the meeting and, according to plaintiffs, the meeting was closed in violation of the Illinois Open Meetings Act, 5 ILCS 120/1.02.  According to plaintiffs, the purpose for closing the meeting was to prevent them from objecting to this action by the Village. This meeting was recorded, but the Complaint alleges that the recording was deliberately erased to cover up the tortious purpose of the action. D Construction terminated Landscaping from the project.

D Construction also entered into a subcontract with Nursery. Plaintiffs allege that Administrator Ingalls and Mayor Blum ordered D Construction to fire Nursery from this subcontract as well. In addition, Landscaping entered into a subcontract with another firm, S.A. Issert, Inc. ("Issert"), which was also involved in the Mississippi Avenue Project. Despite the fact that Issert told Elwood that it did not want to fire Landscaping, Administrator Ingalls and Mayor Blum told it to do so.  Issert ultimately refused to fire Landscaping.

These allegations have given rise to several different causes of action which will be tried to a jury, including false arrests of both Ron Jr. and Ron Sr., malicious prosecution of Ron Sr. for aggravated assault, Section 1983 claims brought on behalf of both based on these claims and, interference with contract and prospective economic advantage of the Plunk family companies.  The plaintiffs also have alleged spoilation of evidence and equal protection claims.

II. <u>Procedural History</u>

Up until the close of fact discovery on March 15, 2008, this case proceeded down the litigation path in the usual way. On March 12, 2008, however, the Court was asked by plaintiffs to re-open discovery for the limited purpose of re-deposing two Elwood Village police officers, one of whom, Officer Adams, was involved in the arrest of Ron Sr. The reason for the request was that plaintiffs' counsel had received an anonymous letter stating that these two police officers had testified falsely due to intimidation by Chief Albert and others. Because the note was unusually specific about these allegations, the Court re-opened the depositions to allow plaintiffs to inquire about this. Both witnesses admitted that they had not been truthful during their depositions about key facts due to intimidation by Albert, Ingalls and defense counsel, Michael Cainkar.[1]  In fact, Officer Adams testified that he had been the author of the note sent to plaintiffs. During their depositions, both Officer Adams and Officer Lightfoot confirmed that they felt intimidated and Adams further testified that he had heard Chief Albert tell police officers on several occasions that the police needed to keep Plunk Sr. "out of town" and that he "needed to go to jail."

Officer Lightfoot testified that a Village employee named Brandon Doden had heard Chief Alberts give instructions to Donchez to destroy evidence on a police computer shortly after the lawsuit had been filed.  Lightfoot contemporaneously recorded the conversation he and Doden had conducted about this event in a calendar entry.  Doden also gave a sworn

---

[1]        The Court informed Mr. Cainkar that he was likely to be a witness in the case and suggested that he procure other counsel for his clients.  Though several months later, Mr. Cainkar has now withdrawn from the case.

statement that Chief Alberts told Donchez to erase the memory of the hard drive on the Police Squad Room computer.

The fact that plaintiffs, by April of 2008, had developed a record of potential witness tampering and destruction of evidence caused both sides to seek additional expert discovery. At that time, plaintiffs had only disclosed their expert Bruce Koenig. Koenig had opined that the audio tape of the April 19th meeting of the Board of Trustees, during which the Village Board voted to terminate the Plunk Landscaping company from serving as a subcontractor on a Village project, had been erased professionally or replaced with a new tape. This Court gave leave for defendants to depose Koenig and to designate their own expert on this issue on or before July 7, 2007 and plaintiffs would be given a month to depose that expert(s). Instead of naming an expert to rebut Koenig, whose testimony regarding the audiotape has not been rebutted by defendants, defendants identified Nancy Forster as an expert. Forster, in her report, opined that the hard-drives of Alberts and Donchez neither had been tampered with in any way nor wiped clean.

Plaintiffs sought and obtained leave to name an expert to rebut Forster's findings regarding the integrity of the Elwood Police hard drives. That expert, Jerry Saperstein, Ph.D., issued an expert opinion on August 25, 2008 in which he stated, among other things, that wiping programs had been installed on Alberts' and Donchez' computers and that the computers may have beenn wiped just prior to the imaging of those hard drives. Plaintiffs first had served defendants with requests for electronically stored information ("ESI") in March 2007. The parties had agreed that defendants would image all of the hard drives of the all of the Villages' nineteen computers and perform word searches to determine whether

relevant documents existed. Despite this explicit agreement, during a hearing before this Court on October 2, 2008, counsel admitted that not all of the hard drives had been imaged–and further, that he had known this since at least the previous November. No steps were taken to preserve these materials between November 2007 and October 2008. These six additional hard drives were imaged after October, but did not yield additional relevant ESI.

Plaintiffs' expert, Dr. Saperstein, supplemented his August 25, 2008 report on December 30, 2008. He stated that his examination of the six hard drives showed that there had been no effort made to preserve evidence which might have existed on them at the time plaintiffs originally requested (and defendants agreed) that all relevant hard drives would be imaged. Defendants, however, have now withdrawn Forster, their identified expert. They chose to do this after it became clear during her deposition that she could not opine that the hard drives of Alberts and Donchez had not been wiped. Defendants now demand that the Court either strike Dr. Saperstein's Supplemental Report or allow them to "redepose" him about those conclusions *and* further to re-open discovery to allow them to designate yet another expert on this subject, David Knutson.

III. Rulings on Defendants' Motions

A. Defendants' Motion for Leave to File Affirmative Defenses (dkt.111)-Denied

One of the defenses defendants now seek to raise is that the criminal charges which are the subject of Count X were concluded more than one year before the claim for malicious prosecution was added by the Second Amended Complaint and, accordingly, is time-barred under the Tort Immunity Act, 745 ILCS 10/8-101. The Second Amended Complaint was filed nine months ago. At that time, the defendants moved to dismiss several counts, including

other contentions that portions of the Complaint were time-barred. The defendants offer no reason why they failed to raise this same argument with respect to the malicious prosecution claim at this time (although they were undoubtedly aware of it), or at any time since then. Discovery, as discussed above, has been closed for some time.

Further, as plaintiffs point out in their opposition to the motion, the statute of limitations does not bar this claim because Federal Rule of Civil Procedure 15(c)(1)(B) provides that the claim asserted relates back to the date of the original filing if it "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out–or attempted to be set out–in the original pleading." The factual basis of this claim, which alleges that defendants brought false charges against Plunk Sr., has been part of the factual basis for the Complaint since it was filed. (*See* Complaint, ¶¶ 33-34, 41-43, 55-56.) Accordingly, the amendment to add this affirmative defense would be futile.

Defendants also seek to amend their affirmative defenses to add an "advice of counsel" defense to the allegation that the prosecution of Ronald Plunk, Sr. was not malicious. In their motion, the defendants implicitly concede that allowing them to interpose this defense now, after the close of discovery, would require plaintiffs to "interview" the States Attorney who they now claim vetted the prosecution. Of course, it is more likely that this new witness, heretofore undisclosed by the defendants in any discovery response, would have to be deposed by plaintiffs. The defendants offer no reason why they have waited until after discovery has closed to raise this defense. The fact that it only just occurred to defense counsel to find the State's Attorney in question and interview him does not justify such an amendment. As the defendants know, the right to amend pleadings, while liberally allowed under Rule 15(a), is

not unlimited. Under that Rule, "a district court may deny leave to amend on the grounds of undue delay, bad faith, dilatory motive, prejudice, or futility." *Guise v. BMW Mortgage, LLC*, 337 F.3d 795, 801 (7th Cir. 2004).

Not only is the proposed amendment very tardy, defendants do not offer any specific allegations which would convince this Court that there is a factual basis to assert this defense. Their pleading asserts merely the obvious fact that the criminal prosecution of Plunk Sr. was approved by a state's attorney. But this is more than likely true in every case. Whether the defense is a valid one under Illinois law depends not only on what information was given to that official, but whether it was truthfully given. *Freides v. Sani-Mode Manufacturing Co.*, 33 Ill.App. 2d 291, 296, 211 N.E.2d 286, 289 (Ill. App. 4th Dist. 1965) (noting that the validity of defense depends upon facts and circumstances communicated by the defendant to his attorney whose advice must be sought, given and acted upon in good faith.) Although defendants seek to add this defense now, which they concede would require the Court to re-open discovery, they have not demonstrated that this witness, if believed, could even establish the elements of the defense. Accordingly, this motion is denied.

B. Defendants' Motions to Bar Testimony of Saperstein (dkt #107) and to Re-Open Discovery on His Supplemental Report (dkt #108)-Granted in Part, Denied in Part

Defendants argue that the Court bar plaintiffs' expert, Dr. Saperstein, from testifying in this case (dkt #107) unless it also reopens discovery to allow him to be re-deposed (dkt #108) on the opinions offered in the recent amendment to his Rule 26 (a)(2) disclosures. What the defendants fail to recognize is that it was their own dilatory discovery tactics that created the need for Dr. Saperstein to amend his report in the first place.

Defendants revealed at the October 2, 2008 hearing before the Court that there were additional hard drives which they had not imaged even though they (1) agreed to image *all* hard drives used by Village personnel shortly after the litigation was filed *and* (2) their counsel was aware for almost a year that this agreement was not being honored by the Village, but did nothing to preserve the evidence contained on those hard drives. Dr. Saperstein's supplemental opinion became necessary only when defendants failed to live up to their own discovery obligations and produced - long after fact discovery had closed - six more imaged hard drives of Village personnel. Presumably, had those six hard drives been part of the response to discovery, as they most assuredly should have been, Dr. Saperstein would have included findings about those hard drives in his original analysis. Further, it is only as a result of defendants' own proffered expert opinion from Forster, now withdrawn, which was that certain hard drives were not wiped clean, that plaintiffs were forced to name their own expert in the first place.

Despite the fact that the relief they seek is the result of their own failure to live up to discovery obligations, defendants offer no explanation for their conduct. In the interest of fairness to all parties, and because the Court will not allow defendants to name yet another expert, which they belatedly have sought to do (see below), the Court will allow a short deposition of Dr. Saperstein regarding that part of his supplemental report extending his findings to the newly produced hard drives. (There will be no need for him to discuss Mr. Knutson's methodology because the Court will not allow defendants to call Knutson as an expert witness in this case.) Defendants will pay not only for Dr. Saperstein's time and expenses in connection with that deposition, but also the fees of one of plaintiffs' attorneys to

prepare for and attend that deposition. This seems a fair discovery sanction for defendants' failure to follow the rules.

C.    Defendants' Motion to Re-Open Discovery to Name Expert (dkt #109)-Denied

Defendants also have moved to re-open discovery to allow them to call a new expert in the case. Having recently acquired new counsel, defendants apparently believe that it is appropriate to have a "do over" of the expert discovery phase of this case.[2] Defendants began the expert's exploration of whether it could be shown that certain hard drives had been wiped clean prior to being imaged and preserved for ESI production when they named Nancy Forster as an expert in this area. Defendants asserted that she would testify that Donchez' and Alberts' computers had not been tampered with prior to being imaged for discovery purposes. This caused the plaintiffs to seek out their own expert, Dr. Saperstein, who is prepared to testify not only that these hard drives had been wiped clean, but that the defendants' failure to preserve other hard drives in the case caused ESI to be irretrievable lost. When Forster was deposed, she could not substantiate defendants' position or her own report. Plaintiffs filed a motion, since mooted by the defendants' withdrawal of Forster, to strike her as an expert under *Daubert v. Merell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and Rule 702.

When they produced the six hard drives they had failed to produce earlier in the litigation, defendants did so with the findings of David Knutson who asserted, among other

---

[2]    New trial counsel finally entered the case at the end of January 2009. However, defendants knew as early as April of last year that Mr. Caincar had been identified as a participant to conversations testified to by two witnesses. These witnesses stated that they had been intimidated by Chief Albert and Mr. Caincar. Thus defendants had known for some time prior to replacing Mr. Caincar that he would likely be a witness in this case because Mr. Caincar denies that he did anything to influence these witness' testimony.

things, that these hard drives had not been wiped clean. Of course, this is not plaintiffs' contention. They contend that the preservation of the hard drives had been requested (and agreed to) as early as March of 2007, but that had not occurred. As Dr. Saperstein states in his Supplemental Report, that relevant information certainly could have been overwritten even if not deliberately deleted. In their motion, defendants do not make clear exactly why the Court should re-open discovery to allow them another crack at this issue. In fact, they do not even disclose the nature of Knutson's proffered expert testimony except to state that allowing him to testify as an expert would enable the Court and jury to enjoy a "complete exposition regarding the allegations that ESI was deliberately destroyed by the Defendants...." What this suggests to the Court is that defendants plan to call Mr. Knutson to testify about the matters for which their first expert was named, deposed and then withdrawn. If the Court allows this, Mr. Knutson would have to prepare an expert report, followed by a deposition and, likely, a rebuttal report by Dr. Saperstein and a rebuttal deposition of him regarding the rebuttal report. In other words, the Court would be forced to vacate the trial date of the case, now set for August, simply because defendants decided to withdraw their first expert because she proved unsatisfactory after cross-examination. Such a procedure is patently unfair to plaintiffs who not only went to the expense of finding an expert on this subject because defendants put it into issue with Forster's purported opinion, and then went to the time, effort and expense to prepare for and take her deposition.

    The Court sees no reason to rescue defendants from a situation which is entirely of their own making and is particularly disinclined to do so when defendants do not even make

clear in their motion the precise matters to which that expert will testify.  Accordingly, defendants' motion is denied.

IV. <u>Rulings on Plaintiffs' Motions</u>

A.      Plaintiffs' Motion for Fees and Costs Regarding Withdrawn Expert (dkt #116)-Denied

Plaintiffs have moved for their fees and costs associated with preparation for and examination of defendants' now withdrawn expert, Nancy Forster.  As stated above, defendants' withdrew Ms. Forster as a witness after her deposition and the subsequent *Daubert* motion.  Although defendants have argued that the withdrawal of Forster was part of an overall litigation strategy, it seems clear from the record (and the defendants' stated need to replace her as evidenced by their motion to re-open discovery) that the reason that she has withdrawn is that she could not testify consistently with the stated conclusions of her report.  Why defendants did not "vet" this expert in a more thorough way is unfortunate, but they themselves will bear the brunt of that misfortune because they do not have expert testimony to challenge Dr. Saperstein's findings.   Although there is ample evidence that defendants did not adequately explore Forsters' ability to render the opinion they hoped that she could offer, there is no evidence of bad faith, especially given defendants' prompt withdrawal of Forster after plaintiffs moved to bar her testimony.   Therefore, the Court declines to award further sanctions with respect to this witness.

B.      Plaintiffs' Motion to Compel Board Minutes Relating to Attorney's Advice-Granted in Part, Denied in Part (dkt #115)

As detailed above, during an April 19, 2006 meeting of the Board of Trustees, the Village Board voted to terminate the subcontract of Allied.   Although that meeting was

recorded, the recording no longer exists. Plaintiffs' expert has opined that this recording was either professionally erased or the tape of the meeting was replaced with a new tape. His opinion neither has been challenged under *Daubert* nor will the defendants call an expert to rebut his findings.

Of course, we will ever know what actually happened at this meeting. Instead we are left with the foggy recollection of the participants, some of whom are individual defendants, now that they are aware that a lawsuit has been filed. Defendants agreed to waive the privilege as to the Village Attorney, Ed Graham, who advised them that the termination of the Plunks' subcontract was an appropriate action to take. A dispute has arisen, however, concerning the scope of that waiver. Plaintiffs have moved to compel the production of two subsequent Village board meetings' minutes at which Graham appeared and the matter was discussed. Both of these meetings took place after the lawsuit was filed. Defendants have objected. Although they concede that they have waived the privilege as to the sum and substance of Graham's advice, they argue that one of these meetings was for the purpose of discussing whether the Village should act to waive the privilege and therefore is not discoverable. The other meeting occurred after the waiver was made and the minutes refer to the decision.

The parties do not disagree about the law applicable to this dispute which holds generally that all communications relating to the same subject matter of the waiver are discoverable. *See Chinnic v. Central DuPage Hosp. Ass'n*, 136 F.R.D. 464, 465 (N.D. Ill. 1991). They do disagree, however, about whether the matters raised in the two different subsequent meetings fall within the same subject matter which, for purposes of this motion,

-14-

the Court defines as the decision of the Village to terminate the Plunks' company from a contract with the Village. The Court has examined the records of both hearings. The first of these, conducted on May 16, 2007, should be turned over to plaintiffs forthwith. Although the Village officials discuss whether the waiver is advisable, they also discuss the facts presented to the Board which governed the original decision to terminate the contract. These topics are too intertwined to separate and the balance clearly weighs in favor of disclosure, particularly when defendants are unable to produce any record of what was said at this meeting.

The Court will not require defendants to produce records of the second meeting. The only topic discussed was their attorney's views regarding the requirements of the state Open Meetings Act which is not fairly encompassed by the waiver.

C.      Plaintiffs' Motion To Re-Open Discovery (dkt #117)-Denied

Plaintiffs also have requested that the Court re-open discovery for the purpose of allowing their expert to examine the Village's computer system in the hope that some of the deleted ESI was backed up in another way on the computer system. The Court is not persuaded that re-opening discovery at this late juncture is justified here. Everything presented thus far to the Court suggests that this would be an expensive and ultimately futile endeavor. Further, plaintiffs have known for some time that there were significant compliance problems on the part of defendants with respect to the preservation of ESI, but chose to wait until the close of discovery to raise this request for the first time. Under these circumstances, the Court declines to grant their request.

D.      Plaintiffs' Motion for Sanctions (dkt #114)-Granted in Part, Denied in Part

Any one of the actions plaintiffs describe in their motion, taken on its own, would raise a question about whether defendants take seriously their obligations under Rule 26 of the Federal Rules of Civil Procedure to produce non-privileged documents which are "relevant to the subject matter in the pending action," including documents and information that are "reasonably calculated to lead to the discovery of admissible evidence." Preservation of materials which meet this broad definition is, of course, the requisite precursor of any real compliance with a party's discovery obligations.

In this case, plaintiffs' allegations take place against a backdrop of other alleged misconduct. There are credible allegations that one of the named defendants, Chief Alberts, engaged in witness intimidation. Two witnesses, Officers Lightfoot and Adams have admitted that they were not completely truthful in their testimony because their chief, who is a named defendant, explicitly tied their performance in depositions to their continued employment at the Village. According to both witnesses, Chief Alberts also told the officers that they did not have to attend their depositions despite the fact that they had been subpoenaed. These officers also testified that during witness preparation, defendants' prior attorney, Michael Cainkar, reiterated that their jobs could be impacted by their deposition testimony. Mr. Caincar denies that this occurred and has since withdrawn from the case.

Although the Court has not heard this testimony itself, it is clear that both officers made admissions harmful to defendants at their second deposition. Officer Lightfoot testified that another Village employee had told him that he had heard defendant Albert tell defendant Donchez to wipe a police department computer *and* that this occurred after the instant case was filed. This employee, Brandon Doden, has confirmed that he heard Chief Albert tell

Donchez to do this in a sworn statement. In their response to the motion for sanctions, defendants now accuse Doden of perjury, a strong accusation which has not yet been substantiated.

We turn to plaintiffs' motion for sanctions with this history in mind. The motion, which requests that the Court enter default judgment against defendants, is divided in four parts: (1) the alleged erasure or replacement of an audiotape of the April 19, 2006 meeting of the Village Board of Trustees during which the Plunks' company was recommended for termination from any Village contract; (2) the destruction/failure to preserve relevant ESI on police department computers; (3) the failure to preserve ESI on six computer hard drives produced for the first time in the fall of 2008 and (4) the failure to back-up any relevant ESI. In addition, although plaintiffs concede that they were eventually able to get at the truth despite efforts to intimidate witnesses, they also ask for fees and costs associated with the re-opening of discovery for this purpose. If the Court is unwilling to enter a default judgment, plaintiffs request that other sanctions, including adverse inference instructions, as well as an assessment of fees and costs, be entered against defendants. For the reasons set out below, the Court will not enter a default judgment against defendants. To ameliorate prejudice to the plaintiffs from defendants' acts, however, the Court will enter other appropriate sanctions now.

We turn first to the applicable legal standards. The Court's authority to sanction a party for failure to preserve documents is both inherent and statutory. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 50-51 (1991) (stating that federal courts may sanction bad faith conduct by its inherent powers or under the Federal Rules of Civil Procedure); *Barnhill v. United States*, 11 F.3d 1360, 1368 (7th Cir. 1993) (same). The purpose of imposing sanctions is to prevent

abuses of the judicial process and to promote the efficient administration of justice. *Barnhill*, 11 F.3d at 1367; *Langley v. Union Electric Co.,* 107 F.3d 510, 513 (7th Cir. 1997). This power includes sanctioning parties for failure to preserve potential evidence that is properly discoverable. *Wiginton v. Ellis*, No. 02 C 6832, 2003 WL 22439865, at *3 n. 5 (N.D. Ill. Oct. 27, 2003). Any award of sanction "must be proportionate to the circumstances surrounding the failure to comply with discovery." *Langley,* 107 F.3d at 515 (internal citations and quotations omitted); *United States v. Golden Elevator, Inc.,* 27 F.3d 301, 303 (7th Cir. 1994); *Crown Life Ins. v. Craig,* 995 F.2d 1376, 1382 (7th Cir. 1993).

At its essence, plaintiffs' claim for sanctions involves the spoilation of evidence to which, due to the relevance of that evidence, it was clearly entitled. For each alleged failure, the Court must analyze each of the following questions: (1) was there a duty to preserve the specific documents/evidence?; (2) was that duty breached?; (3) were plaintiffs harmed by the breach?; and (4) was there wilfulness, bad faith or fault? Finally, the Court must determine whether the proposed sanction can ameliorate the prejudice from the breach or whether there is a lesser sanction available, which will accomplish that goal. *Larson v. Bank One Corp.,* No. 00 C 2100, 2005 WL 4652509, at *9 (N.D. Ill. Aug. 18, 2005). For the Court to enter a default judgment as a sanction, it must be convinced by clear and convincing evidence not only that the violation occurred under the analysis outlined above, but that the loss of the evidence itself causes irreparable damage to the plaintiff's case. *See Danis v. USN Communications, Inc*., 98 C 7482, 2000 WL 1694325, *34-35 (N.D. Ill. Oct. 23, 2000) (discussing cases); *Bryant v. Gardner,* 587 F. Supp.2d 951 (N.D. Ill. 2008).

A.      Alleged Destruction of Audiotape

Plaintiffs argue that they are entitled to default judgment as a sanction because there is evidence that defendants erased the audiotape of a Village meeting during which the Village made the decision to terminate the Plunks' contract.  At this meeting, the Village's attorney also gave an opinion concerning the legality of terminating the Plunks' existing contract with the Village.   Defendants primarily respond that (1) they were not under any duty to preserve the audiotape because they had no notice of the litigation, and (2) there is no evidence that the tape was destroyed, but only inadvertently erased.

Regarding the Village's duty to preserve the audiotape, this Court finds that the Village was on notice that any action it took with respect to the Plunks' contract would, in all likelihood, be the subject of future litigation.  As plaintiffs point out, the Village sought the advice of counsel before the Village meeting because it knew that there might be litigation with the Plunks. The Village's attorney, Edward Graham, testified that he warned the Village that termination of Landscaping's contract could expose the Village to a suit for tortious interference and, but for the prospect of this potential litigation, the meeting probably would not have been closed to the public. Further, as its attorney recognized,  the Village had a clear statutory obligation to preserve the record of this Village meeting under Section 120/206 (a) of the Illinois Open Meeting Act.  Defendants argue that this requirement does not matter because plaintiffs do not have a private right of action under the Act.  But this argument misses the point.  In this case, defendants were aware that a lawsuit regarding any decision they made at the meeting to terminate Landscaping's contract would likely result in litigation *and* that the Open Meetings Act required at least defendant Village to keep the audiotaped record of the

meeting. (In fact, the Village Clerk testified that she was aware that the Village also had a duty to reduce the meeting to a verbatim transcript and prepare written minutes, neither of which was done.) Thus, there is no doubt that defendants had a duty to preserve this evidence and that they breached this duty.

The prejudice to plaintiffs is obvious. During this meeting, all of the named defendants, except the police chief, were present and they discussed not only whether to remove the Plunks' company from a Village contract, but also the pending criminal prosecution of Plunk Sr. as a justification for the decision to do so. A record of that discussion, otherwise closed to the public (including the Plunks), is important evidence on many issues that are at the heart of this case, including whether the probable cause for the two arrests was real or manufactured by the defendants as part of a scheme to, "keep him [Plunk Sr.] out of town" or "take him to jail, " statements which Officer Adams directly attributed to Chief Alberts prior to Plunk Sr.'s arrest. Evidence of the meeting is even more critical to the issue of whether defendants wrongfully interfered with plaintiffs' existing contract on the Mississippi Avenue project.

Defendants argue that the failure to preserve this audiotape was an inadvertent act, a mistake for which they should not be held accountable. But the evidence, which they misconstrue in their responsive brief, shows otherwise. Plaintiffs' expert, Bruce Koenig, has testified that the April 19, 2006 tape-recording of the meeting was professionally erased or replaced with another blank tape. Defendants have not countered that testimony with a different theory. In fact, defendants have not offered any explanation for the fact that the audiotape of the meeting is now blank. The Village Clerk, Patricia Buchenau, testified that

she followed her normal procedures during the meeting in question: she tested the tape recorder before the meeting, it was working properly and  it was on and recording the discussion during the meeting.  All  of the individual defendants, as well as Ms. Buchenau, have denied tampering with the tape in any way, although it appears from the record that at least Administrator Ingalls, and perhaps others, may have had access to it because Buchenau also admitted that she took all of her directions from defendants Blum and Ingalls.  In addition to the evidence that the tape was professionally erased, or replaced,  defendants have no explanation for failing to keep at least a written record of the meeting.   Defendants had an opportunity to rebut Mr. Koenig's testimony with expert testimony of their own.  They chose to rest on their arguments that the tape recording was accidentally erased.

Plaintiffs' requested sanction is an extremely severe one.  As the Seventh Circuit has emphasized, the interests of justice are best served by resolving cases on their merits  *Long v. Steepro,* 213 F.3d 983, 985 (7th Cir. 2000).  Dismissal with prejudice requires a showing that defendants' conduct was wilful, in bad faith or the result of fault.  *Long,* 213 F.3d at 985 (citing *Schilling v. Walworth County Park & Planning Commission*, 805 F.2d 272, 275 (7th Cir. 1986)).  In *Marrocco v. General Motors Corp.,* 966 F.2d 220, 224 (7th Cir. 1992), the court explained the differences between these different degrees of culpability;  "'[b]ad faith,' for instance, is characterized by conduct which is either intentional or is in reckless disregard of a party's obligation to comply with a court order. 'Fault,' by contrast,  doesn't speak to the noncomplying party's disposition at all, but rather only describes the reasonableness of the conduct–or lack thereof–which eventually culminated in the violation."

Here the record shows that defendants' conduct was objectively unreasonable. Defendants have offered no credible explanation as to why they failed to preserve an audiotape which both their knowledge of this potential lawsuit mandated that they keep and that the Village was mandated by state law to preserve. In addition, there also is some credible evidence here that someone deliberately erased or replaced this tape recording. Mr. Koenig has ruled out an accidental erasure of the tape recording and his opinion has not been rebutted.

The Court has broad discretion to fashion an appropriate sanction to remedy the wrong done to plaintiffs, but this sanction must be proportionate with the circumstances involved. *Barnhill v. U.S.,* 11 F.3d 1360, 1367 (7th Cir. 1993). A default judgment requires clear and convincing evidence of misconduct, while lesser issue-related sanctions require the Court to find by a preponderance of evidence that such misconduct occurred. *Maynard v. Nygren*, 332 F.3d 462, 468-69 (7th Cir. 2003); *see also Larson v. Bank One Corp.*, 00 C 2100, 2005 WL 4652509, *8 (N.D. Ill. Aug. 18, 2005).

Without hearing the testimony of all of the witnesses regarding this audiotape, which will occur at trial, the Court cannot find that plaintiffs have met their burden of proof and that a default judgment is warranted here. Even if the Court were to find that standard met, however, the harm to plaintiffs caused by the destruction of this evidence can be ameliorated by a more proportionate sanction. There are three core incidents which are at the heart of this case, although plaintiffs have alleged them under a variety of legal theories: the arrest of Ron Sr. and Ron Jr., the arrest and prosecution of Ron Sr., and the Village's intentional efforts to deprive the Plunks of their contractual rights and prospects as a subcontractor. (Plaintiffs also have alleged that defendants' destruction of the audiotape and ESI create liability under

spoilation of evidence and other theories.)  The evidence on this audiotape was potentially relevant concerning defendants' intent, but it almost certainly would not be dispositive of plaintiffs' claims, especially the core false arrest and prosecution claims.  The decision to arrest the Plunks and to file criminal charges against Plunk Sr. already had occurred prior to the meeting and none of the actors involved in those decisions, except the Mayor, were present at the closed meeting.  Although plaintiffs might have been able to pursue additional legal theories against all or some of the defendants (or even name additional defendants) depending on what was said at the meeting about these matters, plaintiffs' ability to collect damages remains anchored by the harm flowing from the arrests and prosecution.  Similarly, although the Village decided to direct its general contractor to terminate Landscaping from the Mississippi Avenue project at that meeting, there are less drastic, but still effective sanctions to remedy plaintiffs' prejudice.

The Court accordingly enters the following sanctions.  First, during the trial of his case, the Court will not allow defendants to rely on anything that occurred during this meeting in defense of any of the claims in this lawsuit.  The jury will be told that the Village made the decision to terminate the contract at this meeting, but that is all.  Second, the Court further will instruct the jury at trial that defendants had a duty to preserve the record of the meeting which they breached and therefore its absence may be considered as evidence of defendants' wrongful intent on the termination question.  The Court will consider further sanctions after it has had an opportunity to hear all of the testimony concerning the alleged destruction of the tape at the trial of the case.

B.    Failure to Preserve ESI/Destruction of ESI

Plaintiffs also argue that the defendants:  (1) destroyed and failed to preserve relevant ESI on police department computers; (2) failed to preserve ESI on six computer hard drives produced for the first time in the fall of 2008; and  (3) failed to back-up any relevant ESI. Plaintiffs notified defendants of their duty to preserve ESI as early as July 26, 2006, several months before they actually filed this lawsuit.  Beginning in March of 2007,  shortly after the case was filed, plaintiffs served defendants with discovery requests and the parties agreed upon the manner and method of the production of documents, including ESI.  Counsel for defendants agreed that defendants would image the hard drives of all computers on which Village business was conducted (a total of nineteen computers) and perform certain word searches to identify responsive documents.  Despite this effort, only a handful of e-mails relevant to this dispute were recovered and produced.

Defendant hired an expert who admitted at her deposition that there were wiping programs installed on computers belonging to defendant Alberts and Donchez.  She also admitted in her deposition that she could not ascertain for certain whether the wiping programs had been utilized before she imaged the computers in May of 2007, several months after the request to preserve the information had been made by plaintiffs.  She did state, however, that Donchez' and Albert's hard drives had been "defragged" prior to the imaging process which would have destroyed any evidence of a deliberate effort to wipe the computers.  Both Forster and plaintiffs' expert, Dr. Saperstein, discussed a process called defragmentation which automatically rearranges files on a hard drive so that they are contiguous.  This causes existing data  to be moved  and re-written to the surface of a hard drive.  Empty spaces, which would

occur when files were deleted, automatically would be overwritten by this data. Once defragmentation occurs, it is impossible to determine whether files were deleted to a certainty. The record shows that the Donchez and Albert computers were defragged many times after the preservation notice was sent to defendants and even after the agreement to image the hard drives had been reached.

Defendants do not dispute these facts. Further, they concede that they did not produce six Village computers that they acknowledge were encompassed by their agreement with plaintiffs a year earlier. Two of those computers belong to Village employees who were witnesses to the alleged assault at issue in this case and on whose testimony they clearly intend to rely. Defendants admittedly had no document retention policies for ESI on any of their computers, nor did they place any sort of litigation "hold" on the ESI after being informed that it should be produced. But they contend because "routine defragmentation and wiping" has resulted in the destruction of some relevant documents, particularly on those computers that they failed to image in their initial production, they should not be sanctioned, citing *Winginton v. Ellis,* 02 C 6832, 2003 WL 22439865 (N.D. Ill. October 27, 2003). But defendants clearly fail to comprehend the holding of that case. The court in *Winginton* excused the destruction of documents when it was pursuant to a routine document retention policy and when it was prior to notice of the need to retain those documents. But the court found sanctionable the failing to preserve documents scheduled for destruction, pursuant to an established policy, after the parties were on notice that the documents were discoverable. "At that point, " the court wrote, "we must find the reason for the destruction becomes because the party knew that relevant evidence was contained in the documents and wanted to hide the adverse information,

rather than because the documents were scheduled to be destroyed." *Id.* at *7. Even assuming that the destruction of relevant information was accidental, as defendants argue, there is ample evidence in this record to find that the failure to preserve ESI in this case was reckless and that defendants are at fault as the Seventh Circuit has defined that term. In addition, there is, in the testimony of Officer Lightfoot and Brandon Doden, some evidence in this record that the hard drives of certain of the computers were deliberately wiped.

Defendants nevertheless argue that plaintiffs are not prejudiced because they cannot point to any "missing" documents. Defendants claim that the dearth of ESI is simply because there were few e-mails or other documents that were responsive to discovery requests. Putting aside the fact that it is impossible for plaintiffs to know what evidence was destroyed unless they are clairvoyant, Dr. Saperstein had identified several e-mail "chains" in which it is clear that some of the e-mails referred to are missing, suggesting that relevant documents were destroyed accidentally, if not intentionally.

The Court is unable to determine whether these acts were intentionally done without first hearing from the occurrence witnesses. Until it does so, the Court is unable to find the kind of bad faith that would warrant the extreme sanction requested by plaintiffs. However, even without this evidence, the Court finds that plaintiffs have established by a preponderance of the evidence that defendants were at fault and acted recklessly. Accordingly, the Court will order the following sanctions against defendants. First, the jury will be informed that the defendants failed to preserve information which existed on its computers even though it was on notice that it should preserve that evidence in this lawsuit. Second, the defendants will be precluded from arguing that the absence of any documents supporting plaintiffs' contentions

should be considered by the jury against plaintiffs.  Finally, the jury will be instructed that it may (but does not have to) infer that the failure to preserve relevant evidence which defendants had a duty to preserve means that the evidence contained on the computer hard drives was not favorable to defendants.

        C.      Other Relief

As the Court already has discussed, plaintiffs were forced to re-take two witnesses' depositions because the witnesses stated, under oath, that they were intimidated by defendant Alberts and attorney Caincar; the Court will reserve ruling on plaintiffs' request for fees and costs for these depostions until after it has heard these witnesses at trial and can make appropriate credibility findings.  Because plaintiffs have substantially prevailed on their motion for sanctions, however, the Court does order defendants to pay for the fees and costs incurred by plaintiffs for the preparation of this motion and supporting brief.  Plaintiffs are to submit a bill of costs to the Court on or before June 8, 2009.  Defendants may file any objections on or before June 15, 2009.  The Court will rule on the petition for fees and costs by mail.

**IT IS SO ORDERED.**

**ENTERED: May 20, 2009**

                                        Susan E. Cox
                                        United States Magistrate Judge